IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RECEIVED
MAR 1 1 2021
AT 8:30
WILLIAM T. WALSH
CLERK
M

```
                              )
                              )
BRIAN A. PERRI                )
        Petitioner            )   Case No.
                              )
-v-                           )   COMPLAINT FOR DECLARATORY AND
                              )   INJUNCTIVE RELIEF
Warden of the Federal Corretional)
Institution Fort Dix          )
and MICHAEL CARVAJAL, in his  )
capacity as Director of the   )
Bureau of Prisons,            )
        Respondents           )
                              )
```

## INTRODUCTION

1. On April 11, Warden David Ortiz warned prisoners at the federal Correctional Institution at Fort Dix, "social distancing is not possible in this environment." Just days earlier, the Federal Bureau of Prisons had reported that the first prisoner at Fort Dix had tested positive for COVID-19  Today, it reports 797. The Fort Dix facility has 13 housing units and a Camp compound of which, every housing unit and the Camp is currently infected with the corona virus.

2. Around the world, life changed nearly overnight, as people and governments battle to slow the spread of COVID-19 with the infected, sick and dying increasing everyday. The U.S. is now locked in a deadly cycle of setting then shattering records for new cases and hospitalizations. On November 17, more than 70,000 coronavirus patients were hospitalized nationwide. And unlike in earlier waves, which were fairly regionalized, the virus was as of January 2021 spreading and fast in virtually every part of the U.S., according to John Hopkins University data.

3. This coast to coast surge is pushing hospitals across the country to the edge of catastrophe. Doctors and nurses exhausted and their intensive care units running dangerously low on beds as some cities are already playing out their dystopian worse case scenarios. Dr. William Moss, executive

director of the International Vaccine Access Center at the Johns Hopkins Bloomberg School of Public Health, "We're going to have to continue our social distancing and mask wearing for the foreseeable future...". Dr. Bradley Benson, a professor at the University of Minnesota Medical School, "My dream would be that politicians and people who have the trust of each side of the political aisle would come together and at least make a shared statement that COVID-19 is not a political thing and this is real and this is what you need to do to stop the spread."

4. In New Jersey, the second-hardest hit state in the United States residents here news from hospitals and nursing homes and understand the terrible toll the virus inflicts upon any population where it spreads unchecked: rampant illness and death, especially for people who are medically vulnerable because of their age or underlying health conditions. They understand halting the spread of COVID-19 requires hand washing, personal protective equipment, "social distancing," and the maintaing of a measurable distance between people that the virus cannot bridge. The Court is fully aware of the "devastating impact" the COVID-19 pandemic has had on the U.S. broadly and New Jersey more specifically, and the drastic changes to both daily life... See United States v. Mcfadden, No. 19-15, 2020 U.S. Dist. LEXIS 130127, 2020 WL 4218397, at *3 (D.NJ. July 22, 2020). See also Thaker v. Doll, 1451 F. Supp 3d 358, 2020 WL 1671563, at *2 (M.D. Pa. 2020), describing the wide ranges of the pandemic...

5. And now new cases of the highly contagious variant of the corona virus that was discovered in the UK continues to to be found in New Jersey in increasing numbers. Governor Phil Murphy's administration announced Friday five new case of the variant were discovered recently, bringing the state to 38 cases. The first two case of the variant were discovered last month. Two new case were discovered in Ocean County, which has 14 of the 38 cases, and one each in Morris Hudson, Passaic counties. Burlington Coutny where Fort Dix is (4), Atlantic (1), Essex (6), Hudson (2), Mercer (1), Middlesex (2), Monmouth (2), Morris (3), Ocean (14), Passaic (2), Warren (1); (www.nj.com)

6. At Fort Dix about 2,700 prisoners hear the same news and understand the same requirements. Yet Petitioner is unable to protect himself the way others outside the prison can as in Petitioners' home which remains COVID free. Petitioner lives in a 12 person room with rows of bunks less than three feet apart and spends his time in the same rooms, phone booths bathrooms, and mealtime pickup lines where social dist ancing is impossible.

The impossibly of social distancing is not just warden Ortiz's warning, it is simply a fact.

7. Respondents have compounded the risk to Petitioner incarcerated in Fort Dix by until recently, refusing to test, medically isolate, or quarantine the overwhelming majority of Fort Dix inmates, and by contravening the guidance of Attorney General William Barrs' April 3, 2020 memoorandum to immediately transfer medically "at-risk" prisoners to home confinement after declaring Petitioner at high risk for a fatal outcome. Respondents' failure to take appropriate and necessary action while a COVID-19 infection spreads through the prison is the kind of indifference proscribed by the Eight Amendment.

8. In a declaration the ACLU of New Jersey received from Dr. Joe Goldenson, a physician with decades of experience in correctional health cautioned without significant changes, Fort Dix is speeding towards a catastrophe. "It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as Fort Dix." The only way of stopping the exponential spread of COVID-19 at Fort Dix, and the serious illness and death of prisoners and BOP staff, is by significantly reducing the population density and rigorously adopting the Centers for Disease Control Guidance regarding testing, medical isolation, quarantine, and social distancing for those who remain, to ensure constitutionally compliant custody.

9. For Petitioner who is medically vulnerable every day brings increasing panic and increasing risk of serious illness or death. This petition may be my last chance in the wake of the COVID-19 catastrophe overwhelming the prison. Petitioner on behalf of himself, being in a class of medically vulnerable persons, identified as such by warden Ortiz, incarcerated at FCI Fort Dix now and in the future, brings this action for declaratory and injunctive relief, for enlargement of custody.

### PETITIONER

10. Petitioner has been classified by the BOP as a "chronic care inmate. Petitioner is medically vulnerable to COVID-19, and in his compromised states with the following issues: emphysema, (COPD), High risk of lung cancer, heart disease causing respiratory issues, anemia, and asthma, he is at a greater than normal chance of contracting and further spreading

3

COVID-19.  In a letter sent to Petitioner's brother from warden Ortiz he identifies Petitioner as being at "high risk for serious outcome due to COVID-19." (see exhibit-a).  Petitioner has no prior convictions and was previously on pretrial, home confinement being recognized by the court and the government as, "not a danger to the community."  He has been convicted of a nonviolent crime.  No evidence to support he is violent.  No evidence to support he has harmed or will harm the public.  When Petitioner was subjected to electronic monitoring for more than 9 months there were no issues with him accessing any websites, etc.  He was not a flight risk   In addition Petitioner remained working in his full time position and worked a second job in the evenings.   Therefore Petitioner should be a candidate for home confinement.

        11. As stated above Petitioner suffers from a proverbial storm of preexisting conditions of which one or more disabilities are recognized by the Rehabilitation Act.  These preexisting conditions substantially elevate his risk of contracting the COVID-19 contagion and placing him in the class of high-risk susceptibility category as identified by FCI Fort Dix Warden Ortiz. If Petitioner's petition is not granted he most certainly faces a heightened risk of death or serious illness from the COVID-19 disease. Petitioner simply has no way to protect himself against the virus in light of the unsafe conditions is his cell block and impossibility of social distancing in his cramped jail-quarters.   The actual morbidity risk Petitioner faces from COVID-19 as a consequence of his emphysema (COPD), immunosuppressing medications, and asthma, and other serious illnesses is particularly severe.   Petitioner's medical condition is degrading being recently diagnosed by the cardiologist with the high probability of a blocked heart valve adding to his breathing issues and after being at St. Francis Hospital in Trenton, for respiratory issues, diagnosed by the BOP as a high probability of having lung cancer.   The Centers for Disease Control and Prevention reports: "People that suffer from emphysema (COPD), asthma and heart conditions have a higher risk of severe illness from COVID-19.   If Petitioner's custody was enlarged to include home confinement or if he were released, he would live with his wife in Pennsylvania, where his home has remained COVID free, where he could safely socially distance and where he has a team of doctors.

        12. Petitioner lives in building 11, where 167 people are currently

infected with the coronavirus, and sleeps on the bottom bunk of a 430 square foot 12 man room with 12 other inmates, in which 6 bunk beds, 12 lockers, and a small table are crammed. He shares computers, phones, bathrooms, and mealtimes with 270 to 300 other men in the building in he east compound of Fort Dix's main facility. In the past eight weeks, Petitioner has watched staff remove people who complained of chest pain, fever, and shortness of breath only after collapsing, seen medical staff rushing in and out of the building, in which Petitioner is housed, and watched ambulances come and go every day, multiple times of the day. For weeks, people around Petitioner have been exhibiting symptoms of COVID-19. Most recently Dominick Pugliese, Reg. No. 72837-067, during a conversation with Petitioner, started coughing up blood, then collapsed to the floor. Mr. Pugliese is now on a ventilator at Francis Hospital. His most recent prognosis is terminal. Mr. Pugliese has a compassionate release petition filed in the U.S. District Court for Third Circuit which was opposed by the government for the following reason; COVID-19 is "not a threat!'" not an extraordinary and compelling reason." "The BOP and Fort Dix are following CDC guidelines." Mr. Pugliese's rebuttal has yet to be answered by the court.

13. Respondent David E. Ortiz is the Warden at Fort Dix. As Warden, Respondent Ortiz is responsible for and oversees all day-to-day activity at Fort Dix. He is in charge of all aspects of the operations and functions of Fort Dix His responsibilities include ensuring the safety of all in the institution and ensuring that the institution operates in an orderly fashion. Respondent Ortiz is aware of and has adopted and enforced policies that leave Petitioner exposed to infection, severe illness, and death due to COVID-19. Respondent Ortiz has also declined to release Petitioner who qualifies under BOP and Department of Justice guidance despite identifying Petitioner as a person in a class as medical vulnerable, and at high risk despite having the authority to do so.

JURISDICTION AND VENUE

14. Petitioner brings this action pursuant to 28 U.S.C. § 2241 for release from custody that violates the Eighth Amendments to the U.S. Constitution, and pursuant to 28 U.S.C. § 1331 for relief from conditions of confinement that are violation of the Eighth Amendment and the Rehabilitation Act, 29 U.S.C § 794.

15. In addition Petitioner brings this action pursuant to 28 U.S.C. §

5

2241 for release from custody that violates the Fourteenth Admendments to the U.S. Constitution.

16. The Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2241 (habeas corpus). In addition, the Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

17. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continues to occur in this district.

18. This Court has personal jurisdiction over Respondents because at all times relevant to this action Respondent David Ortiz has been employed at Fort Dix in Burlington County, New Jersey, and all the actions and omissions at issue occurred at Fort Dix. Respondent Carvajal has set policies and issued guidance that Respondent Ortiz has applied at Fort Dix in Burlington County, New Jersey.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

19. Petitioner's brother and wife made two applications for Compassionate Release and/or Home Confinement to Respondent Ortiz. Petitioner's brother made a request for compassionate release on Petitioner's behalf which was received by Respondent Ortiz on April 15, 2020, Certified Mail No. 7019 1120 0002 0116 9398. Petitioner's brother received a letter from Respondent Ortiz dated May 21, 2020, past the 30 day deadline requirement for a response, denying them. Petitioner's brother and wife appealed the denials (compassionate release & home confinement) administratively to the BOP Regional Office in Philadelphia, Certified Tracking No. 7018 3090 0000 0754 4592, and office in Washington, Certified Tracking No. 7018 3090 0000 0754 4585. (see exhibit-b). A response was never received. U.S Postal records show the appeals were delivered and signed for on June 23. (4585) and June 25 (4592). On April 20, 2020, Petitioner was informed in writing by his case manager he was denied release on Home Confinement based on A.G. Barr's March 26, memorandum, not on the updated April 3, memorandum which the BOP refuses to recognize. (see exhibit-b)

20. Petitioner has exhausted the administrative remedies available to him. To th extent they are deemed not to have exhausted, Petitioner is excused from 28 U.S.C § 2241's exhaustion requirement. The exhaustion requirement does not apply when the petitioner is likely to suffer an

irreparable injury without immediate judicial relief or where the administrative remedy would be futile. Here both exceptions are met.

See **Woodall v. Fed. Bureau Of Prisons**, 432 F.3d 235, 239 n.2 (3d Cir. 2005) (noting that the Petitioner's failure to exhaust will be excused where exhaustion would be futile); **Lyons v. U.S. Marshals**, 840 F.2d 202, 205 (3d Cir 1988) (noting that "[e]xhaustion is not required if administrative remedies would be futile" if the actions of the agency clearly and unambiguously violate statutory or constitutional rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable injury"); **United States v. Colvin**, No. 3:19-CR 179, 2020 WL 1613943 at *2 (D. Vonn. Apr 2, 2020) (Finding that petitioner seeking compassionate release relating to COVID-19 exhausted administrative remedies where exhaustion would be futile, the administrative process would be incapable of granting adequate relief, and pursuing agency review would subject petitioner to undue prejudice).

21. Here exhaustion is excused because no matter how quickly Petitioner pursues additional process beyond what he already had, the harm he suffers while waiting for exhaustion is irreparable. The densely populated conditions and facility design at Fort Dix exposes Petitioner, who has med cal conditions that make him more susceptible to severe illness and death from COVID-19 to heightened risk of exposure to the disease, in violation of his constitutional rights. Such constitutional injury is irreparable. As a practical matter Petitioner cannot meaningfully engage in any administrative remedy process quickly enough to protect him from the risk of contracting COVID-19 from the people in the facility who have already contracted the virus and the catastrophic health consequences such infection would cause. Petitioner will thus remain exposed to irreparable harm.

22. In sum, the extraordinary circumstances of a severe existing outbreak already at Fort Dix, especially the risk it poses to the class of medically vulnerable individuals housed there such as Petitioner, render further exhaustion a total barrier to any effective relief. For each of these independent reasons, to whatever extent Petitioner is deemed not to have exhausted by virtue of his compassionate release and/or home confinement applications, Petitioner is excused from the requirement of exhausting administrative remedies.

FACTUAL ALLEGATIONS

## I. The COVID-19 Crisis

23. The novel corona virus that CAUSES COVID-19 has led to a global pandemic. More than half of the U.S COVID-19 cases have been recorded since August, and the speed at which they are accumulating is ramping up: more than 1 million new cases were logged in just the week leading up to November 17. The CDC projects 90,000 COVID-19 deaths in the next 3 weeks (Joseph Wilkinson, New York Daily News, Jan 14 2021 www.nydailynews.com/joseph-wilkinson-staff.html). The CDC forecast estimates that by February 6, 2021 between 440,000 and 477,000 Americans will have died from the virus since the beginning of the pandemic. Between 53,000 and 90,000 people in the U.S. will die the next 21 days    The U.S. has been setting and resetting single day COVID death records in the past two weeks, with more than 387,000 people dying in 2021 alone according to John Hopkins data. That's the highest death toll on any country and nearly double that of Brazil which has recorded the second most deaths. (www.nydailynews.com/joseph-wilkinson-staff-html).

24. According to the CDC, people who suffer from underlying medical conditions, many of which qualify as disabilities under the Rehabilitation Act, face elevated risk.[1] Such conditions include chronic lung disease, (COPD), moderate to severe asthma, serious heart conditions, hypertension, high blood pressure, chronic kidney disease, liver disease diabetes, compromised immune systems (such as from cancer treatment, HIV, autoimmune disease, or use of immunosuppressing medications for other conditions), and severe obesity.[2] One analysis found mortality rates of 13.2% for patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[3]

25. In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.

26. In patients who do not die, COVID-19 can severely damage lung tissue  requiring an extensive period of rehabilitation, and in some cases, can cause permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis  or

inflammation of the heart muscle. Mycarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the shor term and long term heart failure that limits exercise tolerance and the ability to work.[4] The estimated fatality rate associated with COV D-19 has been estimated to range from 0.1 · 3.5 percent, meaning COVID-19 may be as much as 35 times more fatal than seasonal influenza.

## II. Incarcerated People and Staff Are Particularly Vulnerable.

27. People in congregate environments such as correctional facilities, where people live, eat, sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in FCI Fort Dix where 800 people already infected and/or sick. People who are confined in prisons, jails and detention centers find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, even with the best laid plans, these settings are particularly vulnerable to what the CDC calls "community spread," where the virus spreads virtually and sustainably within a community even where the source of the infection is unknown.

28. Correctional facilities increase the risk of rapid spread of an infectious disease, like COVID-19, because of the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.

29. The CDC has issued guidance urging prisons administrators to take action to prevent overcrowding of correctional and detention facilities during a community outbreak. The CDC guidance emphasizes that social distancing is a "cornerstone of reducing transmission of respiratory disease such as COVID-19." It calls for not only social distancing, but also measures for isolating and quarantining detainees and staff who have (or are suspected of having) COVID-19 from those who do not have (or presumably do not have) the virus.

30. Many correctional facilities find the implementation of these preventive strategies challenging without a significant reduction in prison populations.

31. The difficulty correctional facilities have complying with CDC guidance is demonstrated by what is currently occurring at Fort Dix. A recent COVID-19 outbreak at Fort Dix quickly spread to about 800 inmates within every housing unit.  In building 11 where petitioner is housed, 167 people are infected.

32. The rapid spread of new variants of the coronavirus some of which seem to be more contagious than older versions, has experts in the U.S. calling for stricker social distancing and better masking to avoid yet another big surge of new COVID-19 cases and deaths.

33. Health advocates and epidemiologists are particularly concerned about what will happen once the new variants find their way into prisons, jails and immigration detention facilities.  Across the U.S, at least one in five incarcerated individuals has already been infected with COVID-19, and a disproportionate number of them have died.  One study found that the 2.3 million Americans living behind bars have twice the risk of dying from COVID-19 as a similar person who is not as Petitioner pointed out in his § 2241 petition (Ground 4).

34. Jaimie Meyer associate professor at Yale School of Medicine and a researcher and clinician who specializes in the spread of infectious diseases behind bars.  The pandemic "has laid [bare] exposed the issues around conditions in confinement," including how difficult or impossible it is to truly safeguard those held behind bars.  In its quest to survive, COVID-19 will find "all of the holes [in our public health strategy]...all of the weaknesses" and pressure like wildfire."  Prisoners are at an increased risk of COVID-19 for a simple reason:  how the virus spreads.

35. Scientist know that the illness is spread from person to person through respiratory droplets and sometimes through the air, which is why being in sustained, close proximity to others is so risky and why crowded prisons and jails are especially dangerous.

36. Contagion also frequently happens even before someone has symptoms, making it impossible to know who to isolate without frequent, rapid, near-universal testing.

37. "Congregate settings in general, and prisons in particular, are places where physical distancing is impossible."  Moreover, people in prisons are more likely to have certain medical conditions including obesity and

diabetes, that put them at greater risk of infectious diseases. The epidemiological realities of COVID-19 have been exacerbated by the failures of elected officials and institutions whose job it is to protect those who are incarcerated.

38. Chris Beyrer, a professor of public health and human rights at Johns Hopkins, has been a vocal critic of Maryland's approach to managing the crisis. In December, cases of the virus in the state's prisons more than doubled. "The single most important thing you have to do to deal with COVID in prison is to [reduce] overcrowding." "We failed at that." Although prison and jail violations dropped at the outset on the pandemic mostly because fewer people entered the system due to virus concerns, rather than early release pushes these populations are now on the rise again.

39. The second most important thing is to implement policies that stem the spread of the disease, including social distancing and giving prisoners and staff masks and other essential supplies. "That too, has been slow, inadequate, and insufficient." Breyer said.

40. For these reasons, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Exercising authority to enlarge custody or release detainees protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and it also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center. Release of the most vulnerable people from custody also reduces the burden on the region's health-care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. As leading pandemic-preparedness expert Professor Nina Fefferman observed, "Epidemiologically, the only way to meaningfully reduce the risks posed to the entire population, inmates, staff, and public, is to drastically reduce the prison population.

41. Absent such measures transmission in prisons and jails will not only endanger the incarcerated, but also burden local hospitals and endanger the broader community. Correctional facilities lack adequate medical facilities to treat serious COVID-19 cases so an outbreak in a prison will oerwhelm local hospitals as evidenced in what is currently occurring at Fort Dix. And as correctional staff enter and leave the facility, they will carry the virus with them. Like the incarcerated people in the facilities where

they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing and because of the shortage of personal protective equiptent|| also known as PPE.

42. As the COVID-19 pandemic has surged, receded and surged again has taken a toll on health cares workers causing "doctor burnout." In the U.S. Alone, more than 218,400 health care workers have contracted the virus and at least 800 have died, according to the U.S. Centers for Disease Control and Prevention; an estimated of 12% of U.S. health care workers have been infected compared to with approximately 3.4% of the general population. And many more are suffering in other ways|| more than 40% percent are reporting worsening mental health issues according to an October survey from the British Medical Association.  As another wave builds|| its safe to say||that many health care workers will not be available. (reported by Francesca Berardi/Turin, Time Dec 2021)

43. On an accelerating basis since mid-March of this year|| courts in this Circuit and across the country have ordered the release of prisoners and detainees in response to the COVID-19 crisis.  See, eg., <u>Arriaga Reyes v. Decker</u>, No. 2:20-cv-03600 (D.N.J. Apr. 12, 2020) (ordering five petitions for immediate release of ICE detainees from New Jersey facilities); <u>Basank v. Decker</u>, No. 1:20-cv-02518 (S.D.N.Y. Mar. 26, 2020) (ordering release of ten individuals detained by ICE housed in New Jersey county Jails because of preexisting medical conditions); <u>United States v. Xue</u>, No. 18-CR-122, ECF 42 (E.D. Pa. Apr. 10, 2020) (ordering pretrial release in light of compelling reason of COVID-19, subject to requirements); <u>United States v. Giordano</u>, No. 14-CR-206, ECF 72 (E.D Pa. Apr. 10, 2020) (granting release of petitioner with medical petitions rendering him particularly vulnerable to the effects of COVID-19 and that petitioner's fear of infection while incarcerated far outweighs any likelihood of fleeing); <u>United States v. Rodriguez</u>, No. 03-CR-217, ECF 135 (E.D. Pa. Apr 1, 2020) (granting motion for compassionate release where the presence of COVID-19, the inmates health conditions, the proximity to his release date|| and his demonstration of rehabilitation created extraordinary and compelling reasons justifying release); <u>United States v. Colvin</u>, No. 3:19-CR-179, 2020 U.S. Dist. LEXIS 57962 (D.|| Conn|| 2020) (Waving exhaustion requirement and granting motion for compassionate release for vulnerable inmate at FDC Philadelphia where "the risks faced by the Defendant will be minimized by her immediate release to home where she

will quarantine herself"); <u>Cornoel v. Decker</u>, No. 20 Civ. 2472, ECF 26 (S.D.N.Y. Mar. 27, 2020) (granting release of four detainees with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19); <u>People of State of N.Y. ex rel. Stoughton v. Brann</u>, No. 451078/2020, 2020 NY Slip Op 20081 (N.Y. Sup. Ct Apr. 6, 2020) ("[C]ommunicable diseases could not ask for a better breeding ground than a crowded prison...Certainly no American prison is equipped to deal with a health crisis of the severity of this one. ").

### III The Efforts of the Bureau of Prisons Are Inadequate.

44. The BOP has failed to respond effectively to the COVID-19 pandemic. The BOP failed to anticipate and prepare for the magnitude of the threat that COVID-19 poses to its own staff and the people it detains; it then failed to respond to any meaningful way to initial signs of uncontrolled outbreaks at several of its facilities across the country, including Fort Dix where the COVID-19 epidemic runs rampant as the BOP facility with the highest number of infected inmates. The BOP has failed to implement even the baseline measures that would assure the safety of its own staff, Petitioner and fellow class members and others incarcerated by the BOP, and of the communities into which staff and others travel on a daily basis. BOP's primary and ongoing failure has been its unwillingness to implement social distancing, despite clear public health guidance that it is necessary to prevent COVID-19 infection.

45. The BOP's preparations were inadequate from the start. Initial guidance from the BOP was not issued until March 9, and it addressed only the possibility of telework for some employees at an agency where the vast majority of workers must physically appear at facilities to do their jobs and it mentioned restrictions only for people who had traveled to already-impacted countries.

46. Because of the BOP's failure to take the threat seriously or to take meaningful steps to prepare stakeholders from every part of the system highlighted preparations that it had not undertaken possible dangers faced by employees and open questions that required urgent attention and answers.

47. Similarly, before the BOP began losing control of COVID-19 in its facilities, officers reported that even as of late March, they were given only gloves not masks, face shields or other PPE when interacting with prisoners sick enough to require transport to the hospital.[5] Those same

officers were ordered back to the job in defiance of CDC guidance that called for self-isolations by correctional staff who had been exposed.

48. Across facilities, the BOP has been "scrambling" to address staffing and resource needs. Despite this the BOP has continued to limit the number of contractors who can supply PPE, does not have enough tests and has been sued by its own staff for requiring them to work in hazardous working conditions.

49. The consequences of the BOP's failures have been dramatic. Nationwide, in the first ten days after the BOP announced positive case in its facilities, the average percentage increase in infections in BOP facilities was, 2,500 percent.

50. Even that figure is almost certainly an undercount. The BOP has repeatedly understated the scope of the problem and refused to take steps to assess the situation transparently. For example, as of April 6, the BOP had reported eight prisoners and one staff had tested positive at FCI Elkton.[6] Press accounts, however  reported that medical staffing had fallen to fifty percent of capacity, and that three prisoners had already died as of April 6.[7]. The full scope of the problem did not become clear until Federal Judge Gwin in **Wilson v. Williams**  2020 U.S. Dist LEXIS 87607, ordered the facility to increase testing, after the BOP admitted that it only had 55 tests on hand for a facility of more than 2,400 prisoners.[8]

51. Conditions had deteriorated so thoroughly that Ohio Governor Mike DeWine called in the state's National Guard to FCI Elkton federal prison.[9] At the press conference announcing that decision, Governor DeWine called on the BOP to stop sending new prisoners to Elkton.[10] And the accuracy of the BOP's reporting of COVID-19 cases in Elkton is in doubt.[11]

52. Ultimately U.S. District Court Judge Gwin for the Northern District of Ohio ordered enlargement of custody for medically vulnerable prisoners at FCI Elkton pending resolution of a class habeas petition on the merits, because of the outbreak already raging at the facility.[12]  Judge Gwin granted a preliminary injunction after the BOP defied a court order calling the lack of testing at the facility a "debacle."  Judge Gwin said he was issuing the injunction because 9 inmates died, 59 inmates and 48 staff having confirmed cases...  believing the actual infection rate could be higher.

53. Even in the midst of the virus's rapid spread across the country,

the BOP persists in transferring detainees between prisons.   BOP Employees report that BOP "continuously move[es] inmates by bus and/or airlift to various prison sites across the nation.   They have authorized movement of infec ed inmates, inmates suspected of being infected, inmates who have been in close contact or proximity to infected inmates, to areas of the country, that do not have any rate of infections.   In a complaint filed with the Occupational Safety and Health Administration by a division of the American Federation of Government Employees states the Federal Bureau of Prisons is "proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities," and its "actions and inactions are expected to result in death and severe health complications and/or possible life long disabilities." ...Government Executive, cites "imminent danger" conditions at facilities nationwide.   Council of Prison Locals C-33, "The BOP has violated national regulations... The complaint states among other things;(1) Authorized the movement of inmates with suspended or confirmed coronavirus cases to areas nationwide...;(2) Failed to mitigate the spread of corona virus...;(3) Failed to maintain social distancing guidelines...;(4) failed to provide PPE...;(5) Directed staff to return to work showing systems of having the virus... (https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-dang er-spreading-covid-19-union-says/164390/.

55. For all of the reasons, the threat posed to people incarcerated by the BOP remains ongoing and acute  As of January 1, the active cases jumped 6% from a week earlier to 7,275 active inmate cases.   1,714 sick staff, a five percent jump, COVID in 127 BOP facilities and 193 dead inmates, 9 in the last week.   The BOP has tested sixty four percent of all inmates at least once, with the positivity rate climbing another two points to forty percent. Twenty BOP facilities report more that 100 inmates COVID cases with four of them between 200 and 300 and Fort Dix with over 700 sick inmates.   Fort Dix is experiencing its second COVID-19 spike, having peaked previoulsy at 303 inmates on November 30.  The BOP claimed the number of sick inmates to a mere 16 only nine days later.  But on December 23, it climbed from 20 to 150 sick inmates overnight, and last night the count skyrocketed to 787. (Burlington County Times, FCI Fort Dix sees 2nd COVID outbreak as active cases top 450 (Dec 30)).

56. Represenative Hakeem Jeffries noted the BOP's underutilization of compassionate release before the House Subcommittee on Crime, Terrorism, and

15

Home Land Security stating that while 2000 such motions have been grated by courts the BOP had approved only 11 requests when inmates first asked to the agency to do so. "10,929 requests out of 10,940 requests were rejected, does that sound right?"

57. Such conditions at numerous facilities across the country have led BOP employees including corrections officers to file a complaint with the Occupational Safety and Health Administration (OSHA) alleging unsafe conditions at numerous federal prisons nationwide, including Fort Dix. Among other things, the officers' OSHA complaint points to the BOP having "directed staff through the Bureau of Prisons who have come in contact with, or been in close proximity to, prisoners who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines." It also complains of the BOP having failed to undertake any workplace or administrative controls to address transmission, to require social distancing or other measures in the CDC guidance, or to provide sufficient PPE[13].

58. In an apparent response, the BOP released a short document titled "Correcting Myths and Misinformation about BOP and COVID-19.[14] In attempting to rebut the assertion that staff who had been in contact with prisoners who showed symptoms of COVID-19 still had to come to work, the BOP simply confirmed that such employees were required to come to work, with masks.[15]

59. The Coronavirus Aid Relief, and Economic Security (CARES) Act, signed into law on March 27, authorizes the Department of Justice to lengthen the maximum amount of time that a prisoner can be placed on home confinement during the pandemic.[16] Acting under that authority, Attorney General Barr made a finding that emergency conditions are materially affecting the functioning of the BOP, and on April 3 he directed Respondent Carvajal to review prisoners with COVID-19 risk factors to determine their eligibility for home confinement, stating that the BOP's efforts to prevent COVID-19 from entering BOP facilities and infecting prisoners have "not been perfectly successful at all institutions."[17].

60. On April 22 the BOP issued a memo purporting to interpret Attorney General Barr's guidance, substantially limiting the number and types of people who might qualify for home confinement under the Attorney General's memos.[18] Even though the April 3 Barr memo directed the BOP to "immediately maximize appropriate transfers to home confinement," including prioritizing

those at "outbreak prisons," the BOP's own guidance excludes the vast majority of prisoners in its custody by adding barriers to consideration for release.

61. The BOP's April 22 interpretation gives wardens virtually unchecked direction to deny ll request for release and imposes unnecessary barriers on prisoners seeking release.  For example, pursuant to the BOP's guidance: (i) prisoners must have no disciplinary infractions of any kind for 12 months; (ii) prisoners must provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, (iii) prisoners with any ongoing medical care must show their medical needs can be met outside the prison, and that they have a 90 day supply of prescribed medications.  Even in lieu of the imposed barriers the BOP has added Petitioner meets the requirements for home confinement.  Petitioner further states his home has remained COVID free and the total number of coronavirus cases at FCI Fort Dix as a percentage of the population is 86% higher than the total number of cases in Berks and Montgomery Counties where Petitioner resides.

62. The appalling conditions of BOP facilities across the country, and the BOP's failures to address the constitutional rights of prisoners in its care, have forced federal courts to address BOP failures in a large number of individuals cases seeking compassionate release;[19] bail pending appeal, trial, or sentencing,[20] delayed self surrender;[21] writs of habeas corpus;[22] class wide relief for groups of prisoners;[23] and furloughs.[24]

63. As noted, the Northern District of Ohio ordered FCI Elkton to release potentially hundreds of medically vulnerable prisoners who face a greater threat from COVID-19   It did this because Elkton had "altogether failed" to follow CDC guidance for correctional settings, and that the measures were "necessary to stop the spread of the virus and save lives."[25]

63a. In the face of its failure the BOP has offered rosy assessments of its own performance and stonewalling in response to requests for public disclosures and congressional oversight.  In June for example, the BOP defended its response to the pandemic as "robust.  In April 2020, after six men had died at Oakdale FCI and the federal corrections officers union was suing, Director Carvajal said "were dealing just as well as anybody else and I'd be proud to say were doing pretty good."

63b.   Even when federal officials had admitted the severity of the pandemic, the BOP has concealed from public view critical information about its management of the pandemic and its efforts to protect the prison population or failure to do so.   For example, Senator Marco Rubio wrote in a letter to the Attorney General that a BOP facility in Florida had failed to follow CDC guidance regarding mask wearing and "may have ordered staff to return to work despite testing positive for COVID-19."   He underscored that "BOP's delay in meaningfully responding to congressional oversight has eroded trust in the BOP" and "potentially" endangered its staff, and the inmates in their care.   Elected officials who sought information from the BOP in March and April reiterated those demands in October citing "mounting evidence that efforts to contain the virus with BOP facilities are failing."

63c.   In February 2021, Senators Bob Menendez and Cory Booker and Congressman Andy Kim led members of the New Jersey congressional delegation in urging the Department of Justice Inspector General to expand his ongoing investigation into the Bureau of Prisons' COVID-19 response to include its handling of an outbreak at FCI Fort Dix.   "Earlier this week FCI Fort Dix once again had the most severe COVID 19 outbreak of all federal prisons and we are alarmed that BOP has repeatedly failed to contain outbreaks at the facility," the lawmakers wrote in a letter to DOJ IG Michael E. Horowitz. "Additional oversight is urgently needed to protect the safety of incarcerated individuals and staff at FCI Fort Dix." (see exhibits 4). BOP's secrecy has dire consequences, as every additonal day of delay, inaction and mismanagement leads to more infections and deaths, and increases the spread of the virus into the larger communities in which the facility is located

IV. The Design of Fort Dix Makes Social Distancing Impossible.

64.   The conditions at Fort Dix pose a grave public health risk for the spread of COVID-19.   The risk is substantially greater than the risk faced by the public or even at many other federal prisons, given Fort Dix's design.

65.   Fort Dix is a low security facility with an adjacent minimum security Camp  The main facilty currently holds more than 2,700 people, and the Camp has, until recently, held approximately 230[26].   Perversely. the design of Fort Dix means that those confined at Fort Dix are designated by

the BOP as the least dangerous prisoners face heightened risk from COVID-19.[27]

66. Except for disciplinary and medical isolation, Fort Dix has no separate one-person housing cells.[28] The main facility is divided in East and West Compounds, with approximately five buildings on each side that can house more than 300 people each. The buildings are three stories high and consist mostly of 12 person rooms with a smaller amount of two person rooms. The 12 person rooms are as small as 430 square feet. Within the space are squeezed six two person bunk beds, 12 lockers, and a card table. Prisoners maintain free movement within the building, sharing common TV rooms, computers, telephones, and bathrooms. Even for the few prisoners in two person rooms, prisoners come into contact with hundreds of people in their building each day.

67. The bathrooms at Fort Dix are communal. In the main facility, each person shares a limited number of sinks, showers, toilets with dozens of other prisoners within just feet of them.

68. The fundamental structure of the low and minimum security Fort Dix facility makes it a COVID-19 deathtrap. It is a substandard, obsolete, and inefficient facility that is more than 70 years old with buildings 42 being condemned. It is not possible for people to engage in social distancing or self quarantine precautions as recommended by the CDC. AS correctional health expert Dr. Goldenson explains, Fort Dix's communal set up makes the social distancing essential to preventing the spread of infection "impossible."

### V. Fort Dix Is Failing to take Proper Precautions, Placing People at an Unconstitutional Risk of Contracting COVID-19.

69. Fort Dix's actions to protect Petitioner from COVID-19 has been slow and inadequate. Although the BOP purported to impose a nationwide quarantine on April 1, Fort Dix failed to impose effective quarantine measures. The prison did not distribute masks to prisoners until early April, and not all prisoners received masks as that time. Correctional officers, who live all over the greater Philadelphia and central New Jersey area, continued to move in and out of Fort Dix each day without sufficient medical screening or protective equipment. At Fort Dix staff members are

not tested for the virus, meaning they could be asymptomatic carriers. "its shocking that prison staff is not being tested both for their health and safety and for benefit of those inside," (Kevin Ring, executive director of Families Against Mandatory Minimums). They move between the Camp and within single buildings in the main facility.

70. The conflicting announcements about masks by Respondent Ortiz and his staff are also telling. The BOP reported the first confirmed case at Fort Dix, a staff member, on its website on March 30. That same day, Respondent Ortiz sent a notice prohibiting prisoners from: "enter[ing] the kitchen on eithe the Ea t or We t compounds for meals with their faces concealed with makeshift masks due to COVID-19 concerns." For a week following this, staff told prisoners they could not wear masks not issued by the prison and ordered them to remove such masks.

71. Fort Dix has still not changed the set up within its main facility buildings  It continues to house the overwhelming majority of prisoners in 12 person rooms where prisoners cannot social distance. Fort Dix made no effort to stagger or isolate bathroom use, ensuring that people from 12 person room would encounter others from the same building. Worse, it took no actions to limit access to, or impose shift based use of, common television rooms, computers, and phones in each building. As a result large groups of inmates congregate regularly in those rooms to this day.

72. Fort Dix has also failed to provide inmates with adequate c eaning supplies. For weeks, Fort Dix maintained its practice of requiring inmates to buy soap through commissary to wash their hands. Fort Dix did not reduce prices for soap  much less make it free. Fort Dix took weeks to install soap dispensers in bathrooms. At present, many of the dispensers are empty because any soap provided by the prison runs out immediately. When soap for dispensers is available its kept locked in a store room and taken out only when staff is available  or when an inspection it to occ r.

73 The scant soap that is provided by the institution, (4 ounces). two small bottles a month, barely bigger than what a person can carry on a plane  is wha most inmates must rely on to shower  wash their hands throughout the day, and try to di infect surfaces in their shared living space if the  cannot buy soap at the commissary  And then the facility exasperated th s problem by limiting commissary fo: pe ple.

74. Beyond the limited provision of masks, inmates have been given no other personal protective equipment or cleaning supplies. They have not been provided with gloves or detergents or other sanitizing agents, and some rely on toilet paper and water to wipe down surfaces they touch.

75. Fort Dix's failure to contain movement by prisoners and staff throughout otherwise separate areas of the facility ensured that, once infection arrived, it would not be confined to particular areas, but would spread to other areas, as in fact happened.

76. The latest infections at FCI Fort Dix coincide with the arrival in inmates from FCI Elkton, Ohio; one of the BOP facilities with the greatest number of COVID-19 infected inmates and correction officers. Nine inmates have died from the disease. In early November a posting on the BOP website disclosed at least 160 inmates and 10 correction officers have tested positive for the COVID-19 virus at FCI Fort Dix. The situation is spiraling out of control. In a notice to the inmate population dated November 16, the FCI Fort Dix prison authorities confirmed there are 252 active COVID-19 inmate cases.

77. In a recent case, decided just weeks ago, in <u>United States v. Deperola</u>, District Judge Hilman in the Federal District of Massachusetts granted compassionate release to a Fort Dix inmate (with a violent history) in principal part because of the "recent alarming COVID-19 cases in the Federal Prison: 209 inmates and 10 staff members are infected."

78. <u>United States v. Peilegrino</u>, 2020 U.S Dist. LEXIS 181052, 18-cr-0496 (Sep. 30, 2020). "Finally, the court has considered the section 3353(a) factors, see § 3582(c)(1)(A)(i); <u>United States v. Harris</u> No. 15-cr-0445, 2020 U.S. Dist. LEXIS 179257, 2020 WL 5801051, at *2 (S.D.N.Y. Sept. 29, 2020) (considering the section 3553(a) factors and that under Brooker, when assessing a motion brought directly by an imprisoned person rather than the BOP, the Court is constrained neither by U.S.S.G 1B1.13 s enumeration of extraordinary and compelling reasons, nor by its free standing requirement that the defendant seeking release not pose any danger to the community.) The severity of the [defendants] conduct remains unchanged what has changed, however, is the environment where [he] is serving his sentence." <u>Zuckerman</u>, 451 F. Supp. 3d at 336 ("when the court sentenced [Defendant], the court did not intend for that sentence to include incurring a great unforseen risk of severe illness or death brought on by a global pandemic." (quoting <u>United</u>

States v. Rodriguez, No. 03-cr 0271 451 F Supp. 3d 392 407 (E.D. Pa, Apr. 1, 2020))).

79   The FCI Fort Dix "[e]pidemic is particularly troublesome, with Congressional criticism raining down on the BOP even as employee unions finger-point . New Jersey Senators Robert Menendez and Corey Booker wrote to the BOP Director Michael Carvajal accusing the BOP of negligently transferring COVID-19 infected prisoners from FCI Elkton to FCI Fort Dix." (Lisa newsletter for November 16, 2020. www.lisa-legalinfo.com). The Senators said, "it is clear that the BOP does not have an effective plan to ensure COVID-19 positive inmates are not transferring between facilities...

80. The Philadelphia Inquirer reported last week that "as recently as mid-October U.S. Attorney's opposing compassionate release Motions by Fort Dix prisoners argued that the BOP has taken effective steps to limit the transmission of COVID-19." Now, the paper said; "videos purportedly taken by a prisoner inside Building 5812 and circulating among the the family members show a unit in chaos...debris scattered and trash overflowing...a by product of a shortage of staff and healthy inmate workers according to family members."   Lisa Newsletter for November 16, 2020 www.lisa-legalinfo.com (Lisa is a legal information on-line service).

81. The outcry from congressional leaders has prompted the CDC to investigate the negligence occurring at the Fort Dix facility that allowed the largest COVID-19 outbreak in the Federal Prison System. The CDC started inspecting the facility on January 28, and returning on February 10, to re-inspect the facility. Petitioner has filed an FOIA request Certified Mail No. 7018 3090 0000 0754 4684 (see exhibit-b) to the CDC for their report and pictures taken during their investigation of the facility.

82. Fort Dix has also refused to exercise authority it has to release people at high risk from infection, which would protect both those individuals and others who remained in a less crowded facility. Prison staff have told several inmates that they will not release anyone unless forced to, presumably by a Court. Petitioner has been told his request for home confinement is denied on bases not stated in the Attorney General memos. As previously stated in Petitioners' Habeas Petition 28 U.S.C. § 2241.

VI. The COVID-19 Spread Continues Unabated at Fort Dix.

83   "Absolute chaos and terrifying." (Joe Atmonvage, NJ Advance Media

for NJ.com, The Corona virus is running rampant through NJ prison again January 6.). A little more than a month ago after Fort Dix prison reported the most coronavirus cases of any federal facility in the country, an assistant U.S. Attorney wrote to a federal judge that the correctional institution had the virus under control with only 13 inmates positive as of December 17, 2020.

84. Fort Dix is once again the epicenter of the virus in the federal prison system less than three weeks after the first significant wave was tamped down. Nearly 800 inmates out of 2,700 are positive with the virus as of Tuesday, putting the low security-prison once again at the top of the list for the number of cases in the federal prison system according to the BOP.

85. In interviews and court documents, inmates and their families said the situation is getting worse by the day as the outlook becomes increasingly dire. As of last Wednesday the number of infected inmates has climbed to about 800.

86. "it is inhumane the way they are being treated," said Jane Pomroff, whose son has 15 months left on his sentence for drug charges.

87. While assistant U.S. Attorney Angelica M. Sinopole wrote a federal judge in December that the Bureau of Prisons (BOP) has taken "proper steps to prevent further spread of infection and many of the infected individuals already have recovered," inmates describe a different scene.

88. Siddeeq Williams, who is serving a 10-year sentence, is still suffering from symptoms after contracting the virus in October  His pleas for medical help were being ignored, Williams wrote to a federal judge, adding that the number of cases would be "staggering" if the prison were actively testing inmates, according to the court documents.   Your honor this is a cry for help." Williams wrote to the judge on Jan 2, "I am in the middle of the largest COVID-19 outbreak in the federal prison system and I'm sick.  I don't want to die here.  Please send me home where I can get the medical help I need."

89. Tess Borden, an attorney for the American Civil Liberties Union (ACLU) who has been monitoring the prison's response to the pandemic  said the "BOP has failed to keep these people in custody safe and healthy " Including properly testing, quarantining and releasing i mates.

90. Federal lawmakers from New Jersey demanded the prison come up with a plan in November to prevent a future outbreak and halt the transfer of inmates to the prison. "The BOP had months to devise a plan to control the outbreak and stop the spread and they failed.  It's shameful." U.S. Sen. Robert Menendez said in a statement to NJ Advance Media.  "With cases on the rise again at FCI Fort Dix, I urge the BOP to take this seriously and do everything possible to protect the health and safety of the staff and incarcerated individuals."

91. One woman, who asked not to be identified out of fear of retaliation for her son, said her son was transferred from Ray Brook federal prison in New York to Fort Dix in mid-December.  She said he was placed in quarantine with around 60 other inmates who had also been transferred in from around the country.  He received two negative tests upon leaving Ray Brook.  He has since tested positive for COVID-19 while being held at Fort Dix.  He is quarantining in "horrible conditions" with no hot water.

92. Borden, of the ACLU said, "We're hearing reports of extreme sickness, inadequate medical care, wide spread fear and a sense of helpness."

93. On Monday, U.S District Judge Renee Marie Bumb ordered the government to "provide a status update regarding the efforts being taken by the Bureau of Prisons to address the apparent COVID-19 outbreak at FCI Fort Dix." (Joe Atmonvage, NJ Advance Media for NJ.com  The Corona virus is running rampant through NJ prison again. January 6.).

94. FCI Fort Dix sees 2nd COVID outbreak as active cases top 450.  The spread of the virus inside the prison in late October and November and again at the end of the December where active cases inside the prison reached over 800 earlier this month, has been criticized heavily by lawmakers, activists, and inmates' family members, after repeated letters to BOP and FCI Fort Dix Warden Oritz demanding answers for how the virus spread inside the prison and what the BOP did to contain it. On January 15, 2021 members of New Jersey's Congressional delegation led by U.S. Senators Bob Mendez, Cory Booker and Congressman Andy Kim called for Department of Justice Inspector General to expand his ongoing investigation into the BOP's COVID-19 response to include its handling of an outbreak at FCI Fort Dix

95. Earlier this month, Menendez and Booker called for Warden Ortiz to grant home confinement to as many eligible inmate as possible, and Kim called for the prison to be put on llockdown, calling the outbreak "a clear and present danger."

I. Section 2241 is an Appropriate Vehicle to Address Unconstitutional Conditions of Confinement Affecting the Fact or Duration of Custody.

96. Section 2241(c)(3) authorizes courts to grant habeas corpus relief when a person is "in custody in violation of the...law" or treaties of the United States." The Third Circuit has long allowed § 2241 to challenges regarding "conditions' of [] confinement." Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 241 (3d Cir. 2005) (granting habeas petition alleging that the BOP must consider in good faith whether the petitioner could complete the last six months of his sentence in a Community Corrections Center rather a Federal Correctional Institution). Courts have allowed challenges solely on the basis of detention conditions that pose a threat to petitioner's medical well-being. See e.g. Roba v. United States, 604 F.2d 215, 218-19 (2d Cir. 1979) (approving the use of Section 2241 to challenge a prisoner's transfer where that transfer created a risk of fatal heart failure). Given the plain language of § 2241, courts are authorized to grant relief to convicted prisoners.

97. In this case the unconstitutional threat to Petitioners' health and life posed by being held in Respondent's custody is ongoing, not simply imminent.  Every hour that Petitioner is held in Fort Dix, he is at a significantly elevated risk of contracting coronavirus, and because of his medical conditions, his risk of dying from coronavirus is significant. Warden Ortiz has clearly admitted in his letter to Petitioner's brother that Petitioner is in serious danger of a fatal outcome.  Yet, Warden Ortiz continues to put Petitioners' health and life in imminent danger violating Petitioner's Eight Amendment rights.

IRREPARABLE HARM

97a. The Petitioner's claim is rooted in imminent, irreparable harm. Petitioner faces the inexorable progression of a global pandemic one which in now mutating, into new highly contagious variant strains, creeping across our nation, a pandemic to which he is particularly vulnerable due to age,

and underlying medical conditions.   At this point it is not a matter of if COVID-19 is already present in the prison, but the irreparable harm it causes to older individuals or those with medical conditions.

97b. Public health officials health now acknowledge that there is little that can be done to stop the spread of COVID-19 absent effective quarantines and social distancing procedures.

97c. Petitioner is unable to keep socially distant while detained by the BOP and cannot keep the Fort Dix facility sifficiently clean to combat the spread of the virus based upon the nature of the virus.

97d. Based upon the nature of the virus the allegations of current conditions in the facility, (see exhibits-4), and Petitioners' specific medical concerns, detailed above Petitioner faces a very real risk of serious, lasting injury or death.  There can be no injury more irreparable. Thakker v. Doll, 451 F. Supp. 3d 358, 2020 U.S. Dist. LEXIS 59459, 2020 WL 1671563, at *4 (M.D.Pa, Mar. 31, 2020)("Petitioners' face a very real risk of of serious, lasting illness, or death.   There can be no injury more irreparable.")   Malam v. Adducci, 2020 U.S. Dist. LEXIS 599709, 2020 WL 1672662, at *7 (E.D.Mich. Apr, 5, 2020)("The ongoing COVID-19 pandemic create a high risk that absent an injunction by this Court Petitioner will suffer irreparable harm in the loss of health or life as a result of contracting the COVID-19 virus.").  See Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2020) (quoting Northeastern Fla. Chapter Of The Assn. Of Gen. Contractors v. City Of Jackonsville, 896 F.2d 1283, 1285 (11th Cir. 1990)).   Here Plaintiffs have clearly shown that they will continue to spread throughout Metro West and infect additional inmates and staff which could lead to serious medical complications, including death, for these who are exposed to the virus..See   Wilson,   (DE   22   at   17)(Finding   that Petitioners' had shown that would suffer irreparable harm because "it is more than mere speculation that the virus will continue to spread and pose the danger to inmates if [defendant] does not increase its efforts to stop the spread."); See also Basank, 449 F. Supp. 3d 205, 2020 U.S. Dist. LEXIS 53191, 2020 WL 1481503, at *7 ("the risk Petitioners' will face a severe, and quite possibly fatal, infection if they are returned to immigration detention constitutes irreparable harm (457 F. Supp. 3b 1313) harm warranting a preliminary junction."). Bar Becho, 2020 U.S. Dist. LEXIS 66163 2020 WL 1876328, at *6 (S.D.N.Y. Apr, 15, 2020) ("[B]eing in immigration

detention pales Petitioners' at a significant high risk of contracting COVID-19. Indeed, numerous Courts, including this one, have recognized that individuals in carceral settings are at a significantly higher risk of spreading disease."). Valenzuela Arrias, 2020 U.S. Dist. LEXIS 64551, 2020 WL 1847986, at *5 ("petitioners' continued confinement...(2020 Dist. LEXIS 52) would almost certainly cause severe-or-fatal damage to their health. Such and injury constitutes irreparable harm and justifies the issuance of a TRO-): Thanker v. Doll, 451 F. Supp. 3d 358, 2020 U.S. Dist. LEXIS 59459 (M.D.Pa. Mar. 31, 2020). There is no requirement Petitioner show that "they actually suffered from serious injury" to succeed on this claim, see, Helling, 509 U.S. at 33 instead Petitioner can show that the conditions "pose an unreasonable risk of serious damage to their future health," they may succeed on their claim, Helling, 509 U.S. at 35, (alteration omitted).

II. Respondent's Failure to Take Steps to Mitigate Transmission of COVID-19 Constitutes Deliberate Indifference to the Serious Medical Needs of Petitioner.

98. Respondents are violating Petitioners' Eight Amendment rights by continuing to incarcerate him in conditions where it is impossible to prevent transmission of an infectious disease and to protect himself against serious illness that may prove deadly because of Petitioners' vulnerable conditions.

99. Petitioner has been convicted and assigned by the BOP to serve time at Fort Dix. Therefore, the treatment of Petitioner incarcerated at Fort Dix, is governed by the Eight Amendment. As such, he is entitled to be protected from conditions of confinement that create a serious risk to health or safety, including through release from custody when necessary, Brown v. Plata, 563 U.S. 493, 531-32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); see also Farmer v. Brennan, 511 U.S. 825, 834 (1994) (correctional official violates Eight Amendment by consciously failing to prevent "a substantial risk for serious harm"). The threat of exposure to a deadly infectious disease such as COVID-19 constitutes a serious risk to health, particularly for the Petitioner because of his unique vulnerability to COVID-19 as clearly admitted by warden Ortiz. Helling v. Mckinney, 509 U.S. 25, 34 (1993) noting with approval Eight Amendment claims based on exposure to serious contagious

diseases).

100. Under Fort Dix's current conditions, Respondents have not and cannot protect Petitioner from this risk of serious harm.  In these circumstances, enlargement of custody and, if necessary, release, is required to protect Petitioner with high risk health conditions from unconstitutional custody.

101. Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." <u>Helling</u>, <u>509 U.S. at 33</u>. This Court need not "await a tragic event" to find that Respondents are maintaining unconstitutional conditions of confinement. Id This is not only because a tragedy is ongoing, but because even petitioners and class members who have not yet tested positive have a constitutional right to be free from conditions of confinement "pose an unreasonable risk of serious damage to [Petitioners] future health." Id. at 35.

102. The reach of the Eight Amendment includes "exposure of inmates to a serious, communicable disease." <u>Helling</u>, <u>509 U.S. at 33</u>; see also <u>Karolis v. N.J. Dep't of Corr</u>, 935 F. Supp. 523, 527 (D.N.J 1996) ("[P]rison officials have an affirmative duty to protect inmates from infectious disease.") (citations omitted).   The Third Circuit Court of Appeals has allowed prisoners to maintain a cause of action for mental anguish suffered as a result of exposure to tuberculosis, even when the risk had subsided. <u>Plummer v. United States</u>, 580 F.2d 72, 76 (3d Cir. 1978).

103. In this case, as established by the facts above. Petitioner faces a significant risk of exposure to COVID-19, with the attendant risk of death that follows given his vulnerable conditon as celarly recognized and admitted by Warden Ortiz.   Respondents are well aware of this risk, having been alerted to it by the CDC, the Attorney General, BOP guidance, widespread news reporting, and the ongoing outbreak at various BOP facilities including Fort Dix itself.   Indeed, the Second Circuit Court of Appeals, unprompted, acknowledged over a month ago the "grave and enduring" risk posed by COVID-19 in the correctional context. <u>Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons</u>, No. 19-1778, _F.3fd_ ,2020 WL 1320886, at *12 (2d Cir. Mar 26, 2020) see also <u>Jovel v. Decker</u>, No.20 Civ, 308, 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) (finding "extraordinary circumstances of COVID-19

pandemic justified release of immigration detainee from federal detention).

104   Finally as established above, Respondents have not taken steps sufficient to protect Petitioner from the grave risks that are present every moment he is incarcerated at Fort Dix.  Respondent Ortiz has recklessly failed to follow or implement CDC guidance or directives from Attorney General Barr or the BOP.  Respondents are not capable of managing the risk to Petitioner in the facility's current environment. Respondents are holding Petitioner in violation of his Eight Amendment rights by detaining him in the face of significant threats to his health and safety without taking sufficient steps to prevent or address that harm.

III. **The Number of People Currently in the Facility Ensures that Respondents Cannot Implement Recommended Measure Required to Protect Petitioners' Health, and Violates the Eight Amendment.**

105. Prison facilities "are almost perfectly designed and run in a way to promote the spread of the virus throughout these institutions," Dr. Homer Venters, president of the nonprofit Community Oriented Correctional Health Services old ABC News.  "The danger here is that we're not only really going to see the explosion of cases among people who are detained and the people who work there, this is going to drive the entire epidemic curve for this nation up, just when we're trying to flatten it." (ABC News, February 7, 2021).

106. Respondents are violating Petitioners' Eight Amendment rights by continuing to incarcerate him in conditions where it is impossible to prevent transmission of an infectious disease and to protect himself against serious illness that may prov  deadly because of Petitioner's vulnerable conditions.

107. The Eight Amendment in only three words, imposes the constitutional limitation upon punishments: they cannot be cruel and unusual." The Court has interpreted these words "in a flexible and dynamic manner," **Gregg v. Georgia**, 428 U.S. 153  171 (1976) (joint Opinion), and has extended the Admendment's reach beyond the barbarous physical punishments at issue in the Court's earliest cases. See **Wilkerson v. Utah**, 99 U.S. 130 (1879); In r Kemmler  136 U S  436 (1890).  Today the Eight Amendment prohibits punishment which, although not physically barbarous, "involve the unnecessary any wanton infliction of pain,  **Gregg v. Georgia**, supra. at 173  or are  grossly

disproportionate to the severity of the crime, <u>Coker v. Georgia</u>, 433 U.S. 584, 592, (1977) (plurality opinion); <u>Weems v. United States</u>, 217 U.S. 349 (1910). Among "unneccesary and wanton" inflictions of pain are those that are "totally without penological justification." <u>Gregg v. Georgia</u>, supra, at 183, <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1979).

108   As alleged above, the BOP has thus failed to implement effective social distancing across its facilities, including particularly at Fort Dix with disastrous effects.   Part of the failure reflects the nature of correctional confinement; however, a large part here owes to the particular environment of Fort Dix's design  capacity and deliberate choices above policies by Respondents.

109  While a facility like Fort Dix might not be overcrowded under normal circumstance, emergency situations like this one have rendered an otherwise constitutionally acceptable populated facility overcrowded relative to its maximum safe capacity.   The current Fort Dix population of about 3,000 prisoners might not present a constitutional problem in the ordinary circumstances, but that population in the context of the ongoing pandemic ensures that effective social distancing is impossible, and it stymies Respondents' ability to follow and implement the CDC Interim Guidance and other vital transmission prevention measures.

110. Courts have long found that facilities' populations may exacerbate existing harms entirely unrelated to the fact of crowding itself, including cases where populations may inhibit a facility's ability to mitigate incarcerated individuals' risk of contracting dangerous diseases.   The Supreme Court itself has recognized that correctional defendants can violate the Eight Amendment when they crowd prisoners into shared spaces with others who have "infectious maladies." <u>Helling v. McKinney</u> 509 U.S. 25, 33 (1993); see also <u>Hutto v. Finney</u> 437 U.S. 678, 682-85 (1978) (recognizing the need for a remedy where prisoners were crowded into cells and some had infectious diseases).

111. Subsequent decisions have recognized that such crowding can happen across facilities. See <u>Lareau v. Manson</u>, 651 F.2d 96 (2d Cir. 1981) (medical services strained by overcrowding could amount to a constitutional violation).

112. Such decisions make particular sense in light of substantial corroborating evidence that transmission becomes more likely in light of,

among other factors, relative crowding of people together, See, e.g. Joseph A. Bick, Infection Control in Jails and Prisons  45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007) ("The probability of transmission of potentially pathogenic organisms is increased [in jails and prisons] by crowding, delays in medical evaluation and treatment rationed access to soap, water, and clean laundry, [and] insufficient infection control expertise."), available at https://bit.ly/2QZA494.

113. In this case, Petitioner faces an elevated risk of serious illness both because of particular failures on the part of Respondents as alleged above, and because of the number of people in the facility.  The current population of Fort Dix, both of incarcerated individuals and the staff who come through on a daily basis and work in the same confined space, ensures that any effective measures that would mitigate Petitioners' exposure to and risk of serious illness from COVID-19 are impossible to implement.

RISK OF REINFECTION

114. Even for those that have recovered after being infected the risk of reinfection is not speculative.  There are a number of reported cases of individuals who have "recovered" from COVID-19, tested negative and later tested positive again.  See e.g., Sarah McCammon, 13 USS Roosevelt sailors test positive for COVID-19 again, NPR (may 16, 2020)(Reporting 13 Sailors who had apparently recovered from COVID-19, and received negative test results has tested positive for a second time), available at https://tinyurl.com/y7g7ee8u); Brittany Mejia, a returned to hospit 1 COVID-19 unit underscores uncertainty to come, L.A. Times (May 13, 2020)(reporting that patient was hospitalized with COVID-19, discharged in early April, readmitted about two weeks later, and tested positive a second time)[30].

115. There is no no question a Fort Dix inmate was likely reinfected.  He first tested positive for COVID-19 in the Spring of 2020 when he was housed at FCI Elkton, a BOP facility with an early COVID-19 outbreak.  When he was transferred from FCO Elkton to FCI Fort Dix he tested positive again on December 10, 2020.   He experienced much more severe symptoms with reinfection.  See Noah Goldberg, Prisoners at risk of catching COVID-19 a second time behind bars asking to be released, N.Y Daily News (Jan 10, 2021), available at (https://www.nydailynews.com/new york/by-covid-second-cases-among-prisoners-20210111-tedyjcpwzmnajzh3xa4hbgjiiqi-story.html).

31

116.   Reinfection is a factor courts have considered in granting compassionate release.  United States v. Keys, 2020 U.S. Dist. LEXIS 212867 at 8-9 (E.D.CA. Nov. 13, 2021)(Granting compassionate release to inmate "who was infected with COVID-19 but did not develop severe symptoms in part because.. [of] the risk reinfection could have on an inmate's health"). See United States v. Yellin 2020 U.S. Dist. LEXIS (S.D.CA. June 20. 2020)(same); United States v. Sandoval-Flores, 2020 U.S. Dist. LEXIS 210723 at 15-16 (D.UT Nov. 9, 2020)(Discussion regarding CDC update regarding the risk of reinfection from the COVID-19 virus); United States v. Craig, 2020 U.S. Dist. LEXIS 185635 at 5 (D.MD. Oct. 6, 2020)(Recovery from the COVID-19 virus is not firm evidence [Petitioner] is no longer at a heightened risk of severe illness from COVID-19, according to the CDC"). (citation omitted): United States v. Remarque, 2020 U.S. Dist. LEXTS 73000 at 9 n.1 (D. MD Apr. 27 2020)("the Court recognizes that individuals who have tested positive are not necessarily immune from reinfection, citing Stacey Mckenna, What immunity to Covid really means, Scientific America (Apr. 10, 2020)   Significantly, two inmates deaths at FCI Joseph and FCI Memphis were inmates the BOP previously reported as "recovered  (Legal Information Services Association report dated 1/12/21.).  The district court in Craig, supra, noted a pre-existing obesity condition satisfies the "extraordinary and compelling" reason requirement of the Statutes.  To quote the district court in United States v. Haynes  2020 U.S. Dist. LEXIS 71021 at 38 (E.D.N.Y. Apr. 22, 2020) "there decisions reflect, to borrow a term, the right side of history on the crucial question they consider..."   The risk of reinfection at FCI Fort Dix must be considered as part of the Eight Amendment release calculus and the unsafe conditions at this Facility described in Section IV infra leave no doubt Petitioner faces death and/or serious illness as a consequence of this risk if he was to get infected and reinfected.  As district judge Jones eloquently stated in Thakke v. Doll, 2020 Dist. LEXIS 5949 at 19-21 (M.D.PA. Mar 31, 2020).  In times such as this, we must acknowledge the status of a mere few weeks ago no longer applies, our world has been altered with lighting speed, and the results are far more unprecedented and ghastly.  We now face a global pandemic in which the actions of each individual can have a drastic impact on an entire community.  The choices we now make must reflect this new reality. United States v. Laurel, 2020 US.S Dist. LEXIS 135968, ("There is no firm evidence that the antibodies that develop to SARS-COV-2 infection are positive.  If these antibodies are protective, its not known what antibody levels are needed to protect against reinfection.[31]    United States v. Craig

_Allen_, 2020 U.S. Dist. LEXIS 185635 Crim. No. JKB-09-0512 ("[I]t remains uncertain to what degree and for how long individuals with antibodies (neturalizing or total) are protected against reinfection with SARS-COV-2 [.]). Judge Frimm, Judge Hollander, and Judge Chuang of this district have all found that medical conditions that increase the risk an inmates susceptibility to severe illness may constitute "extraordinary and compelling reasons!" even if the inmate has already contracted and apparently recovered from COVID-19.[33] See e.g. _United States v. Williams_, Crim. No. PWG-19-134, 2020 Dist. LEXIS 1010054, WL 3073320 (D.MD. June 10, 2020); _United States v. Kess_, Crim, No. ELH-14-480, 2020 U.S Dist. LEXIS 105986, 2020 WL 3268093 (D.MD. June 17, 2020); _United States v. Fletcher_, Crim. No. TDC-05-0179-01, 2020 U.S. Dist. LEXIS 124089, 2020 WL 3972142 (D.MD. July 13, 2020).

### COVID-19 DEATHS EXCEED NUMBER OF DEATHS IN JAILS, PRISONS BY EXECUTION FROM 1990 TO PRESENT

117. As COVID-19 continues to wreak havoc in Federal prisons and jails across the country the number of virus related prisoner deaths reached 1,453 on November 17, 2020. This number exceeds the 1,406 prisoner executions in death penalty case from 1990 to the present.

118. However, there is where the comparison ends. While executions come after the conclusion of formal legal proceedings, lengthy appeals and involve capital crimes, those who died of COVID-19 while incarcerated were often non-violent offenders, many already elderly, ill or medically compromised.

119  All COVID-related deaths are tragedies to the individuals and families personally impacted.

120. Also consider the suffering, petitioner is forced to endure living in close proximity often without cleaning supplies, soap and personal protective equipment, in an environment where medical care is often an afterthought.   A case of the virus will result in suffering generally alleviated only by Tylenol

121. The entire purpose of FCI Fort Dix is to confine, render powerless and dehumanize those confined here, and subject them to the whims of their jailors, who control every aspect of their daily lives. The level of control extends also to when and if he will be given medical treatment. The cruel, inhumane, degrading conditions, and overcrowding poses a grave risk to Petitioners health and safety. Petitioner has been locked in the same building

since March 2020 with no access to the outside, no visits from his family, no recreation, where social distancing is impossible resulting in infections and death rates that are much higher than in the general population.  During the pandemic his home has remained COVID free.  Petitioner in his compromised state has been moved from a two man room  placed in a twelve man room with inmates transferred in from FBOP Elkton, and infected inmates, putting him at a greater than normal chance of contracting and further spreading the virus.

122.  For a prisoner attempting to prove a violation of the Eight Amendment, "[an] express intent to inflict unnecessary pain is not required. Estelle v. Gamble, 429 U.S. 97, 104 (1976)." Ante  at 319  Rather, our cases have established that the "unnecessary wanton" infliction of pain on prisoners constitutes cruel and unusual punishment prohibited by the Eight Amendment, even in the absence of harm. Ibid,; see also Ingraham v. Wright, 430 U.S. 651, 670 (1977); Gregg v. Georgia, 4218 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).  What the Constitution' general term was undesstood to require had simply changed in light of what the Court called society's "evolving standards of decency." Trop v. Dulles, 356 U.S. 86, 101 (1958) (per Warren, CJ.).

123. Many medical researchers note that even those who have "recovered" will likely suffer the after effects of the virus for the rest of their lives, including shortness of breath and heart damage, and it is highly unlikely that prison medical staff will have sufficient staff and resources to treat health compromised individuals.

124. Although the American justice system has grown quite efficient at arresting, prosecuting and incarcerating 20% of the worlds population, it had been less effective in protecting the helpless and vulnerable individuals it chooses to confine from the ravages of a virus that spreads rapidly from person to person in jails and prisons, sentencing many of those to death as surely as those executed for capital crimes.

FIRST CAUSE OF ACTION
(Eight Amendment)

125. Petitioner incorporates by reference each and every allegation contained in the preceding paragraphs as it set forth fully.

126. Petitioner brings this claim on his own behalf.

127. The Eight Amendment guarantees sentenced prisoners custody free of "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." <u>Hewlling</u>, 509 U.S at 33; see also U.S. Const. Amend VIII.   The government's failure to protect the Petitoner in its custody from widespread outbreak of a serious contagious disease that causes potentially permanent damage or death constitutes deliberate indifference in violation of the Eight Amendment to the United States Cosntitution.

128  Petitioner in uniquely vulnerable to serious complications or death from contracting COVID-19 because of his age and/or because he suffers from medical conditions that render him vulnerbale.

129  Because of the conditions at Fort Dix  Petitioner cannot take steps to protect himself, such as social distancing, hand washing hygiene, or self quarantining, and the government has not provided adequate protections.  As COVID-19 rapidly spreads indside Fort Dix  the already deplorable conditions at the prison will continue to deteriorate, and incarcerated individuals there will continue to contract COVID-19 at staggering rates.

130   Respondents failure to adequately protect Petitioner from these unconstitutional conditions  or release him from the conditions altogether, constitutes deliberate indifference to a substantial risk of serious harm to Petitioner  thereby establishing a violation of the Eight Amendment to the United States Constitution.

131. Respondent's were aware or should of been aware of these conditions, which were and are open and obvious throughout the entire prison.

132. Respondents knew of and disregarded an excessive risk to health and safety.

133  Respondents failed to act with reasonable care to mitigate these risks  subjecting Petitioner to a grave and serious risk of harm of serious illness  permanent injury  or death even after classifying Petitioner as being at high risk for a fatal outcome.

134. Because Respondents failed to act to remedy Petitioners degrading and inhumane conditions of confinement in violation of his Eight Amendment Rights, Petitioner seeks relief under his Writ of Habeas Corpus Petition and Complaint.

135   Because of the unlawful conduct of Respondents   Petitioner is

threatened with imminent physical injury, pain and suffering emotional distress, humiliation and death.

SECOND CAUSE OF ACTION

(Rehabilitation Act)

Unconstitutional Conditions of Confinement In Violation of Rehabilitation Act
28 U.S.C. § 1331

136  The Rehabilitation Act requires entities that receive federal funding  uch as the BOP and Fort Dix  not to discriminate against Americans with qualifying disabilities.

137  Section 504 of the Rehabilitation Act ( RD ), 29 U.S C  § 794 requires entities such as Fort Dix to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

138  Petitioner qualifies as an individual with disabilities under the meaning of the RA

139. Access to safe conditions of confinement and adequate preventative and responsive medical treatment are programs or services that Fort Dix must provide, but is not presently providing  to people in custody to comply with the RA.

140.  Respondents  intentionally  discriminate  against  people  with disabilities by denying the reasonable accomodations  including but not limited to those set out in the CDC guidance  that are necessary to protect them from COVID 19.

141. In a facility with reduced population that might allow adequate social distancing  reasonable living spaces rather than high capacity shared rooms and dorms with people in close proximity; free distribution of adequate cleaning supplies  including soap; free distribution of adequate personal protective equipment, including masks and gloves; staggered access to bathrooms, meals and other shared resources; assignments of correctional staff that mitigates the possibility staff will transmit COVID-19, even asymptomatically  from one building to another, and adequate access to tests and information about risk.

142. Failing to provide these reasonable accomodations violates the Rehabilitation Act, which entitles Petitioner to injunctive and declaratory releif.

36

## THIRD CAUSE OF ACTION

### (Fourteenth Amnedment)

143. Its the constitutional duty of our judicial system to provide the constitutional protections especially for defendants already convicted in the court of public opinion, or historical procedures for limiting state power.

144. Our Constitution is unique because it indisputably establishes the primary of the individual over the state. It guarantees liberties and guarantees the central government will not impair them.

145. In the very famous case of Mayberry v. Madison, of 1803 the Court claimed for itself the power to invalidate acts of Congress that were inconsistent with the Constitution. Such power is called "judicial review," and it is now universally accepted that not only the Supreme Court, but all federal judges, can review and void acts of Congress or acts of the president that the federal judge is able to demonstrate are inconsistent with the Constitution.

146. After the Civil War and the Thirteenth, Fourteenth, and Fifteenth Amendments were added, the courts began interpreting those, especially the Fourteenth, as meaning that not only can the federal government not interfere with liberties guaranteed in the Bill of Rights, but also, none of the state government's can interfere with them either.

147. The Fourteenth Amendment contains a number of important concepts, most famously state action, privileges and immunities, citizenship, due process, and equal protection all of which are contained in section one.

148. The Fourteenth Amendment declares that a state cannot make or enforce any law that abridges the privileges or immunities of any citizen. In the Civil Rights Cases, 109 U.S. 3 (1883), the Supreme Court ruled that the Civil Rights Act of 1875, which prohibited racial discrimination in public accomodations, was unconstitutional because it tried to regulate private actors. The Court decided in United States v. Guest, 383 U.S. 745 (1966) that the Enforcement Clause gave Congress the power to regulate the private of individuals who conspired with state officials to deprive people of their rights under Section One of the Fourteenth Amendment. In later cases, the Courts rejected Guest, and struck down part of the Violence Against Women Act that provided a civil remedy for victims of sex-related violence.

149.  In the Civil cases (1883), the Court ruled that Congress did not have the power to legislate against private individuals, because Section One of the Fourteenth Amendment only applied to actions committed by a state or state agents. However, if the private party discriminates while engaging in public action (such as an organization that accepts federal funding), then that party would be subject to the Fourteenth Amendment.

150.  In Shelley v. Kraemer, 334 U.S. 1 (1948), the Supreme Court decided that the judicial enforcement of a private restrictive covenant that prohibited non-Caucasian occupants violated equal protection to a black buyer, even though enforcing private restrictive covenants was generally valid and enforceable. In Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961), a restaurant which leased space in a public parking garage was found to engage in racially discriminatory practices. The Supreme Court, influenced by the fact that the garage was used for public parking, ruled that the restaurant was closely tied to the state in such a way that the discrimination could be considered state action. As such, the Supreme Court in Reitman v. Mulkey, 387 U.S. 369 (1967) struck down a California constitutional amendment that prohibited enacting any law that restricted an individual from refusing to sell land to a buyer for any reason. The Court's argument seemed to be that the amendment to the state constitution was a state action violating equal protection.

151.  In Corfield v. Coryell, 6 Feb. Cas. 546 (No..3,230)(C.C.E.D. Pa., 1823), an early case concerning the privileges and immunities Clause, found that the Clause protects certain fundamentals rights of all citizens. However, in Slaughter-House Cases, 83 U.S. 36 (1873), the Supreme Court rejected the interpretation, holding that the privileges of national citizenship were substantive, but they came about as a result of the federal government, the Constitution, or other laws. The fundamental natural rights were not included, and thus the equality function of the Privileges and immunities Clause was taken over by the Equal Protection Clause and the substantive functions were taken by the Due Process Clause.

152.  Aside from one case that was later overruled, the Supreme Court did not use the Privileges and immunities Clause as the basis for decisions until 1999 with Saenz v. Roe, 526 U.S. 489 (1999), where California set welfare benefits for new residents at a certain level equal to what their former state provided for the first year of residency in California. The Court decided that part of

the fundamental right to interstate travel was for new citizens of a state to be treated like other citizens of the state.

153. The Fifth and Fourteenth Amendment both contain a Due Process Clause, although the Fourteenth Amendment applies explicitly to the states. The Supreme Court has interpreted the Due Process clause in both articles having the same meaning, as Justice Frankfurter describes in his concurrence in Malinski v. New York, 324 U.S. 401 (1945): "To suppose that "due process of law" meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection."

154. There are some that think when courts confront generally worded provisions, they should infer exceptions for situations that the drafters never contemplated and did not intend their general language to resolve. These people want courts to approach general words differently from how they approach words that are narrow and specific. Traditional principles of interpretation reject this distinction because the presumed point of using general words is to produce general coverage, not to leave room for courts to recognize adhoc exceptions. It is true that literal meaning is more readily discernible when the provisions are concrete and specific than when they are abstract and general, and one is right to hesitate and ponder before deciding that a specific factual situation falls within the coverage of a general provision. But in the end, general words are general words, and they must be given general effect.

155. After the Civil War the courts began interpreting the Thirteenth, Fourteenth, and Fifteenth Amendments, especially the Fourteenth, as meaning that not only can the federal government not interfere with liberties guaranteed in the Bill of Rights, but also, none of the state government can interfere with them either.

156. The Fourteenth Amendment contains a number of important concepts, most famously state action, privileges, and immunities, citizenship, due process, and equal protection all of which are contained in section one. In those post Civil War Amendments to the Constitution courts started to interpret general words with general meanings. The Fourteenth Amendment for example, guarantees equal protection of all the laws to "all persons." Some commentators have argued that because it was enacted for the benefit of blacks, it should not apply to anybody else. (See Ward Farmsworth, Women Under Reconstruction: The

Congressional Understanding, 94 Nw. U.L. Rev. 1229, 1234 (2000). But in the first case to expound the meaning of the Thirteenth, Fourteenth, and Fifteenth Amendments, the Slaughter House Cases 83 U.S. (16 Wall.) 36 (1872) (per Miller J.). The Supreme Court acknowledged the breadth of the language used, as contrasted with the immediate purpose for their passage:

> We do not say that no on else but the negro can share in this protection [of the 13th, 14th, and 15th Amendments]. Both the language and the spirit of these articles are to have their fair and just weight in any question of construction. Undoubtedly while negro slavery alone was in the mind of the Congress which proposed the thirteenth article, it forbids any other kind of slavery, now or hereinafter. If Mexican peonage or the the Chinese labor system shall develop slavery of the Mexican or Chinese race within our territory, this amendment may safely be trusted to make it void. And so if other rights are assailed by the States which properly and necessarily fall within the protection of these articles, that protection will apply, though the party interested may not be African descent.

157. Both text and tradition support this much of the opinion. The language of the Fourteenth Amendment, that no state may deny to any person the equal protection of the law, is very general. Scholarly commentary has long agreed. In 1922 a respected commentator accurately stated: "Although the primary purpose of the Fourteenth Amendment was undoubtedly...to safeguard the negro in his new status of a free man, its actual scope is vastly wider than that, and its effect has been far reaching." (See Charles Kellogg Burdick, The Law of the American Constitution 502 (1922).

158.. Nor could the general wording of the Fourteenth Amendment be confined only to men. And it never has been.. One of the arguments sometimes given out to show that textualists are not really evenhanded is in the argument that despite the Fourteenth Amendment's guarantee of equal protection for all persons, women were not given the right to vote until adoption of the Nineteenth Amendment. That has noting to do with the meaning of person in the Fourteenth Amendment; it has to do with the meaning of equal protection.

159.. Without some indication to the contrary, general words, like those in the Barr April 3 memorandum to BOP Director Carvajal; "include all at risk-inmates..." are to be accorded their fair and full scope. They are not to be arbitrarily limited. This is the general terms cannon, which is based on the reality that it is possible and useful to formulate categories without knowing all the items that may fit, or may later, once invented come to fit, within those categories. Respondents denial of Petitioner for home confinement is prejudicial and in violation of the Fourteenth Amendment to provide Equal

Protection and Due Process.   Respondents intentionally discriminate against
Petitioner by denying him home confinement after identifying him as being a
member of a group of medically vulnerable set out in the CDC guidance.
Petitioner is a member of a group capable of being singled out for
discriminatory treatment because of his conviction, (category of charge).
Castaneda v. Partida, 430 U.S. 482, 494, 97 S. Ct 1272, 51 L. Ed. 2d 498
(1977).   Groppi v. Wisconsin, 400 U.S. 505 91 S. Ct 490, 27 L. Ed. 571
(1971)(defendant on trial for misdemeanor must be given opportunity to show
community prejudice and request change of venue); Sheppard v. Maxwell, 384 U.S.
333, 86 S. Ct 1507, 16L, Ed. 2d 600 (1966)(massive persuasive and prejudicial
pretrial publicity violated defendants Fourteenth Amendment right to Due
Process); Estes v. Texas, 381 U-S 532, 85 S. Ct 1628, 14L, Ed. 2d 543,
(pretrial hearing disrupted by news media allowed to broadcast from the
courtroom; community "bombarded with signs and sounds" of two day pre-trial
hearing).

160.   The Fourteenth Amendment's equal protection clause prohibits any state
from denying to any person within its jurisdiction the equal protection on the
laws...Any time a defendant is singled out for prosecution based on an
unjustifiable standard, such as race, religion, or other arbitrary
classification, the defense should move for dismissal based on an equal
protection clause violation. Supreme Court; Oyler v. Boles., 368 U.S. 448, 82.

161.. In an Eight Circuit case, United States v. South Half of Lot 7 & Lot 8,
Block 14, Kountze's 3rd Addition to the City of Omaha, 910 F.29 488 (8th Cir.
1990)(en banc), the court construed a federal statute allowing the government
to seize "any property, including money," 18 U.S.C. § 1955(d) that had been
used for an illegal gambling business.   The question arose whether "any
property, inlcuding money" included real as well as property.   The Government
had begun forfeiture against 13 parcels of real estate that had been allegedly
been used in an illegal gambling business.   The trial court interpreted the
term property not to include real property and therefore dismissed the
forfeiture actions.   But the appellate court rightfully held that any property
means "any property," real and personal.   It is not limited by the phrase
including money (see § 15 [presumption of nonexclusive "include"]).   As in the
Barr April 3, Memorandum to Director Carvajal; Now, review "All" candidates.
The term all candidates means "all candidates," and release those identified as
medically vulnerable to home confinement.   It is not limited by any other

41

phrase.  An ill-considered disent in, 910 F.2d 488 would have held that the clear language meant something other than what it said, based in part on legislative history (see § 66) and on the "spirt of the law" (sec § 58): (see 910 F.2d at 491 (Heaney, J., dissenting).

161.  The argument most frequently made against giving general terms their general meaning is the one made and rejected in the Slaughter House cases that those who adopted the provision had in mind a particular narrow objective (equal protection for blacks) though they expressed a more general one (equal protection for "any person").  The conclusive response to this argument is that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws that the principal concerns of our legislators by which we are governed," Onacle v. Sundowner Offshore Servvs., Inc., 523 U.S. 75, 79 (1998)(per Scalia, J.).

162.  In the case from which the statement derives, Onacle v. Sundowner Offshore Services, the statute at issued made it "an unlawful employment practice for an employer...to discriminate against any individual...because of such individual's...sex," 42 U.S.C. § 2000e-2(A)(1).  Joseph Onacle sued his employer under Title VII, alleging that his male coworkers had sexually harassed him.  The lower court rejected his claim, holding that Title VII did not cover claims, my males alleging sex discrimination by other males. 'In the Supreme Court Onacle prevailed.  As the Court had held before, the statute protects men as well as women.  And as there is no textual basis for limiting its projections to women, the Court found "no justification in the statutory language or [its] precedents for a categorical rule excluding same sex harassment claims from the coverage of Title VII, 523 U.S. at 79.  The Court acknowledged that "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII," But the statutory prohibition was broadly worded.

163.  The other argument against application of the cannon is slightly less ambitious.  In Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 (1998)(per Scalia, J.), the plaintiff was a prisoner who, because he suffered from hypertension, had been excluded from participating in the prison's motivational-boot-camp program, successful completion of which would have shortened his sentence.  He contended that his exclusion violated Title II of the American with Disabilities Act, which prohibited that "no qualified individual with a disability shall, by reason of such disability, be excluded

from participation in or be denied the benefits of the services, programs, or activities of a public entity..., U.S.C. § 12132. The Act defined public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government. The Department of Corrections argued that Congress could not possibly have had state prison programs in mind, that the question whether the law applied to such programs had no clear answer, and that the ambiguity should be resolved against federal interference with the running of state prisons: "[A]ssuming...that Congress did not envision the [American with Disabilities Act] would be applied to state prisoners, in the context of an unambiguous statutory text that is irrelevant . As we have said before, the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth," 524 U.S. at 212 (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985) (per White, J.)).

164.. A defendant may demonstrate that administration of a criminal law is directed so exclusively against a particular class of persons with a mind so unequal and oppressive that the system of prosecution amounts to a "practical denial" of equal protection the law. United States v. Armstrong, 517 U.S. 456, 458 116 S Ct 1480, 1483 (1996). Violations of Equal Protection can arise, however, not only from facially invalid laws but also from action[s] of the state through its administrative offices .effecting. .prohibited discrimination. Id. at 882 quoting Norris v. Alabama, 294 U.S. 587, 589, 55 S. Ct 579, 79 L Ed. 1074 (1935).

165. "[I]n construing...all written instruments, the grammatical and ordinary sense of the words is to be adhered to unless, that would lead to some absurdity or some repugnance or or inconsistency with the rest of the instrument in which case the inconsistency with the rest of the instrument, in which case the grammatical and ordinary sense of the words may be modified, so as to avoid that absurdity and inconsistency, but no farther." (Grey V. Pearson, [1857] 6 H.L. Cas. 61, 106(per Lord Wensleydale).

166. It is true that literal meaning is more readily discernible when the provisions are concrete and specific than when they are abstract and general, and one is right to hesitate and ponder before deciding that a specific factual situation falls within the coverage of a general provision   But in the end, general words are general words, and they must be given general effect.

167. ..., your review should include all at-risk inmates—not only those who were previously eligible for transfer... . you are directed to immediately

process them for transfer in the residence to which the inmate is being transferred. (Attorney General William Barr, April 3 2020). The meaning is readily discernible, specific and concrete.

RELIEF REQUESTED

WHEREFORE, Petitioner respectfully request that the Court enter a judgement;

1) Declaring Fort Dix's custody of Petitioner violates the Eight Amendment right against cruel and unusual punishment, and the Rehabilitation Act with respect to Petitioner;

2) Ordering Petitioner's immediate release, with or without a period of home confinement, with the following additional supervised release conditions: a) that he be released to reside with his wife Nicola Perri in Boyertown, Pennsylvania; or b) be released to his paternal home where he was located, and subjected to electronic monitoring for more than 9 months awaiting trial, and c) that within 72 hours of release, he contact the U.S. Probation Office for specific reporting instruction;

3) Ordering such other and further relief as this Court deems just, proper and equitable.

FOOTNOTES

1. CDC, Goups at Higher Risk for Severe Illness,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/groups-at-higher-risk.html

2. Id.

3. World health Org., Report of the WHO-China Joint mission or Coronavirus
Disease 2019 (COVID-19),
https://www.who.int/docs/default-source/coronaviruse/
who-china-joint-mission-on-covid-19-final-report.pdf

4. Cynthia Weiss, How does COVID-19 affect the heart?, Mayo Clinic News
Network,
https://newsnetwork.mayoclinic.org/discussion/how-does-covid-
19-affect-the-heart/

5. Joseph Neff & Keri Blakinger, Federal Prisons Agency "Put Staff in Harm's
way of Coronavirus: Orders at Oakdale in Louisiana Help Explain Covid-19
Spread, The Marshall Project (Apr. 3, 2020),
https://www.themarshallproject.org/2020/04/03/federal-prisons-agency
-put-staff-in-harm-s-way-of-coronavirus

6. Id.

7. Ohio Gov. Mike DeWine Authorized Ohio National Guard to Assist Elkton
Prison, WKYC,
https://www.wkyc.com/article/news/health/coronavirus/
ohio-gov-mike-dewine-authorize-ohio-national-guard-to-assist
-elkton-prison-/95-d620f3c6-c560-486f-9eacebce7c09d4e7

8. Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio
facility in wake of Trump's claim that 'anybody' can get tested, Cleveland.com,
https://www.clevleand.com
court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-
lack-of-coronavirus
-tests-at-ohio-facility-in-wake-of-trumps-claim-
that-anybody-can-get-tested.html

9. Ohio Gov. Mike DeWine Authorized Ohio national Guard to Assist Elkton, WKYC
https://www.wkyc.com/article/news/health/coronavirus/
ohio-gov-mike-dewine-authorize-ohio-national-guard-to-assist-
elkton-prison-/95-d620f3c6-c560-486f-9eacebce7c09d4e

10. Cory Shaffer, Ohio National Guard Will Assist Response at Elkton federal
Prison, Cleveland.con
https://www.cleveland.com/coronavirus/2020/04/ohio-national
-guard-will-assist-coronavirus-response-at-elkton-federal-prison.html;
see also Brandon Brown, Sen. Portman Urges Prisoners Not to be Transferred to
FCI Elkton, WFMJ,
https://wfmj.com/story/41979544/sen-portman-urges-prisoners-not
-to-be-transferred-to-fci-elkton

11. Elkton Union President Reports Different COVID-19 Stats Than Federal Bureau
of Prisons, WKVB
https://www.wkbn.com/news/coronavirus/elkton-union-president
-reports-different-covid-19-stats-than-federal-bureau-of-prisons/

12. Wilson v. Williams, No. 4:20-CV-00794, 2020 WL 1940882, at *10 (N.D. Ohio
Apr. 22, 2020)

13. See Notice of Alleged Safety or Health Hazards available at
https://www.afge.org/globalassets/documents/generalreports/coronavirus/
4/osha-7-form-national-complaint.pdf

14. See Fed. Bureau of Prisons, Correcting Myths and Misinformation About BOP
And COVID-19
https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_co
vid19.pdf

15. Id at 3("In keeping with CDC Guidance for Safety Practices for Critical
Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or
Confirmed COVID-19, the BOP performs pre-screening of all employees reporting
to work and requires exposed workers to wear a mask for 14 days after last
exposure.   They are also expected to perform regular self-monitoring for
symptoms, practice social distancing and to disinfect and clean their works
spaces. Anyone who develops signs or symptoms of illness are sent home.").

16. Cares Act, Pub. L. No. 116-136, § 12003(b), 134 Stat. 281 (2020)

17. Memorandum from Attorney General Barr to Director Carvajal (Apr. 3, 2020),
available at https://www.justice.gov/file/1266661/download

18. Memorandum from Correctional Programs Division Acting Assistant Director
Andre Matevousian & Reentry Services Division Assistant Director Hugh J.
Hurwitz  to  Chief  Executive  Officers  (Apr.  22,  2020),  available  at
https://famm.org/wp-content/uploads/bop-memo-4.23.2020.pdf

19. E,g., United States v. Rodriguez, No. 03-cr-271, ECF 135 (E.D. Pa. Apr. 1,
2020)(granting release after finding risk factors for COVID-19 constitute
extraordinary and compelling reason and noting that prisons are "tinderboxes
for infectious disease"); United States v. Foster, No. 14-cr-324-02, ECF 191
(M.D. Pa Apr. 3, 2020), noting the "unprecedented" circumstances facing "our
prison system" and finding that COVID-19 is an extraordinary and compelling
basis  for  release;  indeed,  [n]o  rationale  is  more  compelling  or
extraordinary"); United States v. Smith, No. 12-cr-133, ECF 197 (S.D.N.Y. Apr.
13, 2020)(granting release; finding exhaustion waivable and waived); United
States v. Zukerman, No. 16-cr-194, ECF 116 (S.D.N.Y. Apr. 3 2020)(waiving
exhaustion and granting immediate compassionate release in light of COVID-19 to
defendant in multi-million dollar fraud scheme); (United States v. Sawicz, No.
08-cr-287,  ECF  66  (E.D.N.Y.  Apr.  10,  2020)(releasing  child-pornography
offender); United States v. Clagett, No. 97-cr-265, ECF 238 (W.D. Wash. Apr. 9,
2020); United States v. Oreste, No. 14-cr-20349, ECF No. 200 (S.D. Fla. Apr. 6,
2020); United States v. Hakim, No. 05-cr-40025, ECF 158 (D.S.D. Apr. 6, 2020);
United States v. Hernandez, No. 18-cr-20474, ECF 41 (S.D. Fla Apr. 2, 2020).

20.  E.g.,  United  States  v.  Chavol,  No.  20-50075  (9th  Cir  Apr.  2,
2020)(stipulation in a FRAP(9) appeal to release on conditions); United States
v. Nkanga, No. 18-cr-713, ECF 120 (S.D.N.Y. Apr. 7, 2020); United States v.
Hector, No. 2:18-cr-3-2, ECF 748, (W.D. Va. Mar. 27, 2020).

21. **United States v. Roeder**, No. 20-1682, F App'x (3d Cir. Apr. 1, 2020)(reversing district court's denial of defendant's motion to delay execution of his sentence because of the COVID-19 pandemic); **United States v. Garlock**, No. 18-cr-418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020)(observing that "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); **United States v. Matthaei**, No. 19-cv-243, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020)(extending self surrender date by 90 days in light of pandemic).

22. E.g., **Xochihua-James v. Barr**, No. 18-71460 F. App'x (9th Cir. Mar. 23, 2020)(sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); **Fraihat v. Wolf** No. 5:20-CV-590, ECF 18 (C.D. Cal. Mar. 30, 2020).

23. E.g. In re. request to Commute or Suspend County Jail Sentences, Docket No. 084230 (N.J. Mar. 22, 2020)(releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19).

24. **United States v. Stahl**, No. 180cr-694, ECF 53 (S.D.N.Y. Apr. 10, 2020); **United States v. Underwood**, No. 18-cr-201, ECF 179 (D. Md. Mar. 31, 2020)(noting that although there has not yet been a positive COVID-19 test in the elderly petitioner's facility, "there is significant potential for it to enter the prison in the near future.").

25. Wilson, 2020 WL 1940882, at *8

26. https://www.bop.gov/location/institutions/ftd, Fed. Bureau of Prisons FCI Fort Dix

27. BOP Program Statement P5100.08 (Sept. 12, 2006), available at https://bop.gov/policy/progstat/5100_008.pdf; Fed. Bureau of Prisons, "About Our dacilities," https://www.bop.gov/about/facilities/federal_prisons.jsp

28. https://www.bop.gov/locations/insttitutions/ftd/FTD_prea2.pdf, PREA Audit: Auditor's Summary Report.

30. https://tinyurl.com.y7fpsf5y; Documented 47 reinfection cases since August 2020, with an average interval of 80 days between infectionsd, https://bnonews.com/index.php/2020/08/covid-19-reinfection-tracker/ (last visited Jan 3, 2021).

31. Https://www.nydailynew.com/new-york/by-covid-second-cases-among-prisoners=20210111-tedyjcpwzmnajzh3xa4hbjiigi-story-html

32. https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html

33. http://www.cdc.govlcoronavirus/2019-ncov/lablresources//antibody-tests-guidelines.httnl, (Interim Guidelines for COVID-19 Antibody Testing).